UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JESSICA L. JACKSON,<br><br>Defendant. | No. 2:21-cr-00056-TLN<br><br>**ORDER** |

This matter is before the Court on Defendant Jessica L. Jackson's ("Defendant") Appeal of United States Magistrate Judge Carolyn K. Delaney's denial of her Motion for Judgment of Acquittal. (ECF No. 31.) The Government filed a responsive brief. (ECF No. 34.) Defendant filed a reply. (ECF No. 37.) For the reasons set forth below, the Court hereby AFFIRMS the magistrate judge's denial of Defendant's Motion for Judgment of Acquittal.

///

///

///

///

///

///

///

### I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

The instant action arises out of Defendant's attempt to leave medical care from Mather Veterans Affairs ("VA") Hospital in Mather, California.  (*See* ECF No. 31.)  Defendant was admitted to the hospital in an unconscious state on June 27, 2020, after consuming four MDMA pills and 29 beers.  (*Id.* at 4.)  She awoke sometime later and found herself bound to her hospital bed.  (*Id.* at 2–3.)  Defendant left her room after she was allowed out of bed and called her boyfriend, Channing Thomas ("Thomas"), to ask him why she was in the hospital and to tell him she wanted to leave.  (*Id.* at 3.)  The nursing staff attempted to convince Defendant to return to her bed, and the doctor even explained to Thomas that Defendant should stay for further observation, as "at least one of her lab results was a cause for serious concern."  (*Id.*)  Medical staff called the VA police for "their safety" (*id.*), and Sergeant James McClean, Lieutenant Michael Molitor, and Officer Kathy Farr responded to the ICU (ECF No. 34 at 8).  Defendant moved into a hallway just outside of the ICU — the only hallway into the ICU where a gurney could enter — when the officers arrived, and they witnessed her pacing and talking loudly on her cell phone with Thomas.  (*Id.* at 9.)  Defendant still appeared to be under the influence of drugs and alcohol.  (*Id.*)  While medical staff attempted to persuade Defendant to return to her hospital room, "she refused and repeatedly demanded to leave."  (*Id.*)  Defendant continued to argue with the staff, demanded to be released, and began to push through the outer doors of the ICU corridor, rendering it "essentially unusable."  (*Id.*)  Sergeant McClean then met Thomas and told him to go talk to Defendant.  (ECF No. 31 at 4.)  Thomas noted Jackson did not look good and stated he was not going to discharge her from the hospital or take responsibility for doing so.[2]  (*Id.* at 4–5.)

Defendant began to walk away from Thomas, medical staff, and the officers down a hallway to the hospital's exit, and medical staff told her to stop.  (ECF No. 31 at 5; ECF No. 34 at 10.)  When it became clear Defendant was not going to voluntarily stop (ECF No. 34 at 10),

---

[1]   This factual and procedural background is taken from Defendant's appeal (ECF No. 31) and the Government's response (ECF No. 34).

[2]   As both parties note, the magistrate judge found Thomas's willingness to sign Defendant out of the hospital not to be credible.  (ECF No. 31 at 5; ECF No. 34 at 10.)

2

Lieutenant Molitor and Sergeant McClean stopped her.  (ECF No. 31 at 5.)  Defendant had three police officers, one doctor, two to three medical staff, and one contract security officer tending to her in front of the emergency room doors for approximately thirty minutes.  (ECF No. 34 at 11.)  During that time, other medical staff had to navigate around the staff and gurney in the hallway for Defendant.  (*Id.*)

On June 28, 2020, the Government cited Defendant with a single count of disorderly conduct in violation of 38 C.F.R. § 1.218(b)(11).  (ECF No. 1.)  On February 25, 2021, the magistrate judge conducted a bench trial, witnesses were sworn and testified, and exhibits were admitted.  (ECF No. 19.)  The magistrate judge subsequently found Defendant guilty and imposed a term of nine months of court probation to expire early upon payment in full of all fines and fees.  (ECF Nos. 19, 20.)  On June 17, 2021, Defendant filed the instant appeal, contending the magistrate judge erred by denying Defendant's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 — namely, that "there is insufficient evidence to permit any rational trier of fact to find beyond a reasonable doubt each essential element of the crime charged."  (ECF No. 31.)

## II.     STANDARD OF LAW

18 U.S.C. § 3402 provides this Court with jurisdiction over the instant appeal.  18 U.S.C. § 3402 states: "In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed."  Federal Rule of Criminal Procedure 58(g)(2)(D) outlines the scope of appeal for petty offenses and other misdemeanors, which "is the same as in an appeal to the court of appeals from a judgment entered by a district judge" — namely, "[t]he defendant is not entitled to a trial de novo by a district judge."  "Acting as an appellate court, this Court has the power to 'affirm, modify, vacate, set aside or reverse' the magistrate judge's order and 'may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings to be ha[d] as may be just under the circumstances.'"  *United States v. Ramirez*, No. CR F 08-0239 LJO, 2008 WL 5397497, at *2 (E.D. Cal. Dec. 24, 2008) (citing 28 U.S.C. § 2106).  This Court on appeal reviews questions of law de novo and findings of fact for

clear error. *United States v. Oberdorfer*, No. 3:12-CR-00578-BR, 2014 WL 1343427, at *6 (D. Or. Apr. 3, 2014) (citing *United States v. Ziskin*, 360 F.3d 934, 943 (9th Cir. 2003); *United States v. Perdomo-Espana*, 522 F.3d 983, 986 (9th Cir. 2008)). "This Court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Strong*, 79 F.3d 925, 928 (9th Cir. 1996)).

### III.   ANALYSIS

38 C.F.R. § 1.218(b) lists a "[s]chedule of offenses and penalties" with respect to security and law enforcement at VA facilities. This section provides that "[w]homever shall be found guilty of violating these rules and regulations while on any property under the charge and control of VA is subject to a fine" and violations "may also subject an offender to a term of imprisonment of not more than six months, as may be determined appropriate by a magistrate or judge of the United States District Court." 28 C.F.R. § 1.218(b)(11), the section Defendant was found guilty of violating, specifically lists one of these offenses and penalties as "[d]isorderly conduct which creates loud, boisterous, and unusual noise, or which obstructs the normal use of entrances, exits, foyers, offices, corridors, elevators, and stairways or which tends to impede or prevent the normal operation of a service or operation of the facility, $250." The parties agree that violations of 38 C.F.R. § 1.218 are general intent crimes. (ECF No. 31 at 6; ECF No. 34 at 13); *see also United States v. Szabo*, 760 F.3d 997, 1002 n.2 (9th Cir. 2014) (citing *United States v. Martinez*, 49 F.3d 1398, 1401 (9th Cir. 1995)) ("When a statute does not contain any reference to intent, general intent is ordinarily implied."). "[A] general intent crime requires only that the act was volitional (as opposed to accidental), and the defendant's state of mind is not otherwise relevant." *United States v. Lamott*, 831 F.3d 1153, 1156 (9th Cir. 2016).

In Defendant's appeal, she argues the Government failed to prove she acted with general criminal intent to violate 38 C.F.R. § 1.218(b)(11). (ECF No. 31 at 6–8.) Specifically, Defendant argues the evidence was insufficient to prove: (1) she had the general intent to make loud, boisterous, and unusual noise; (2) she had the general intent to obstruct; and (3) she intended to or tended to impede or prevent normal operations. (*Id.* at 8–14.) In its response, the Government

4

contends that, as with all general intent crimes, it needed to prove only that Defendant acted knowingly when she engaged in the foregoing actions. (ECF No. 34 at 13.) The Government also notes voluntary intoxication is not a defense to a general intent crime.[3] (*Id.* at 13–14.) The Court will address each of Defendant's arguments in turn.

### A. General Intent to Make Loud, Boisterous, and Unusual Noise

Defendant argues the evidence shows she was unconscious at the time she was admitted to the hospital and therefore "had no notice, constructive or otherwise, of the posted regulations."[4] (ECF No. 31 at 8.) Defendant notes no witness testified to the following: that she was being loud; she needed to quiet down or reduce her volume; anyone attempted to communicate to her to lower the amount of the sound she was making; she was too loud for the VA facility; her volume was disturbing normal operations; there was any other patient in the ICU or surrounding area; or staff members were impaired by the volume at which she was speaking. (*Id.* at 8–9.) Defendant maintains staff members paid attention to her, which is what they are supposed to do with a patient in distress — including having two nursing staff talk to her to persuade her to return to her hospital room to receive further treatment. (*Id.*) Defendant notes the Ninth Circuit in *United States v. Agront*, 773 F.3d 192, 196 (2014), interpreted the "loud, boisterous, and unusual noise" prohibition "to prohibit noise which tend to disturb the normal operation of a VA facility." (*Id.*) Defendant maintains, unlike the patient in *Agront*, she still showed signs of being under the influence of alcohol and MDMA after she was conscious and no evidence or testimony was presented to prove she understood she was making a "loud, boisterous, and unusual noise," that she was asked to lower her voice, or that she was aware of her volume and modulated her voice accordingly. (*Id.* at 10–11.)

///

---

[3] Defendant argues in reply that "[v]oluntary intoxication was not raised either as a defense or the basis for challenging the sufficiency of the evidence." (ECF No. 37 at 3.)

[4] In response, the Government states the requirement to post the regulation Defendant was found guilty of violating does not transform the crime into one of specific intent. (ECF No. 34 at 14 (citing 38 U.S.C. § 901; 38 C.F.R. § 1.218).) The Government notes at best it is an affirmative defense and not an element of the offense the Government is required to prove. (*Id.*)

1    In response, the Government agrees *Agront* provides that § 1.218(b)(11), read in conjunction with § 1.218(a)(5), requires the conduct to "tend to disturb the normal operations of a VA facility." (ECF No. 34 at 15.) The Government contends *Agront*, in addition to *United States v. Alexander* (*Alexander I*), 669 F. App'x 434 (9th Cir. 2016) and *United States v. Green*, 28 F.3d 109, 1994 WL 327727 (9th Cir. 1994), are analogous to the facts of the instant case and the Ninth Circuit affirmed a 38 C.F.R. § 1.218(b)(11) conviction in the first two. (*Id.* at 15–16.) The Government argues Defendant knowingly created "'loud, boisterous, and unusual noise' with the end goal of leaving the hospital's care," as she left her room and refused to return to it, she tried to push through the doors out of the ICU when medical staff did not permit her to leave, staff requested police presence to escort her to the emergency department, and she resisted arrest and assaulted an officer. (*Id.* at 16–17.) The Government notes "this behavior 'actually disturbed' the hospital's operations such that medical staff called for police assistance — hardly a normal occurrence in the ICU" and staff "were concerned 'for their safety' after witnessing [Defendant's] behavior in the ICU." (*Id.*)

In *Agront*, the defendant Louis Agront, Sr. ("Agront") was brought by his children to the hospital, who were concerned about "his increasingly erratic behavior." 773 F.3d at 194. Agront became angry, fidgety, "would start to become loud but then reduce his volume," and began yelling with his son in the parking lot loudly enough to be heard in the hospital lobby 25 yards away and to cause the VA staff to call the police. *Id.* Agront was convicted by the magistrate judge of violating 38 C.F.R. § 1.218(b)(11) and appealed. *Id.* at 195. The Ninth Circuit affirmed, finding that the evidence established "his conduct *would tend* to disturb the normal operation of the hospital, but also that the hospital's operation *was actually* disturbed." *Id.* at 199 (emphasis in original). The court noted Agront did not challenge "the magistrate judge's factual findings that (1) the altercation between Agront and his son could be heard inside the facility 25 yards away and (2) a VA nurse and social worker were drawn away from their ordinary tasks to monitor the situation," both of which were "sufficient to establish that the normal operation of the hospital was disturbed." *Id.*

///

In *Alexander I*, the Ninth Circuit considered the defendant Derek Alexander's ("Alexander") appeal from the district court's order denying his motion to reverse his bench trial conviction for disorderly conduct in violation of 38 C.F.R. § 1.218(b)(11). 669 F. App'x at 434. The Ninth Circuit concluded the government presented sufficient evidence "to allow a rational fact finder to conclude beyond a reasonable doubt that Alexander intended to, and did, disrupt the normal operations of the [VA] facility by repeatedly screaming at police officers in the lobby of the building and refusing to obey their commands over a prolonged period of time." *Id.* (citing *Agront*, 773 F.3d at 199–200). Alexander argued he had no intent to disrupt the facility and while the evidence showed he was angry with officers, he was mentally ill and frustrated when attempting to get medication. *United States v. Alexander* (*Alexander II*), No. 3:15-cr-05315-RJB, 2015 WL 13091370, at *4 (W.D. Wash. Sept. 29, 2015). The district court disagreed, noting "intent is reasonably inferred by the circumstances" and Alexander "only needed to know the facts that make his conduct fit the definition of the offense, even if he [did] not know that those facts give rise to a crime." *Id.* The district court noted after Alexander was in the VA facility, he "continued yelling even after a VA staff person began to move patients out of the lobby" and "physically resisted arrest for approximately one minute, requiring several people to restrain him . . . even after an officer expressly attempted to persuade him to deescalate his conduct." *Id.* The district court also found actual disruption of the VA facility because, due to Alexander's conduct, "a VA staff person left his desk and escorted VA patients away from the lobby, while another staff person diverted patients around the situation and called for additional law enforcement." *Id.* at 5.

In *Green*, the defendant William J. Green ("Green") appealed the district court's denial of his motion for a new trial following his conviction under 38 C.F.R. § 1.218(b)(11) on grounds other than sufficiency of the evidence. 1994 WL 327727, at *1. Green sought medical attention at the VA and police were called when he "became surly and uncooperative." *Id.* Green assumed a defensive position and spat in an officer's face before he was handcuffed. *Id.* The Ninth Circuit noted that Green was "boisterous and abusive before he was restrained or charged" and "[e]vidence of his conduct amply supports his conviction." *Id.*

7

Here, the Court finds the Government is correct that the facts of the instant case are analogous to *Agront*, *Alexander I, Alexander II*, and *Green*.[5] (ECF No. 34 at 16–17.) Evidence was presented to the magistrate judge that Defendant "left her room in the ICU and refused to return to it, despite repeated requests from the nursing staff." (*Id.* at 16 (citing ECF No. 24 at 13, 14, 52, 75).) Sergeant McClean testified that Defendant "was being argumentative with the staff there about returning to her room and wanting to leave in a very loud manner." (ECF No. 24 at 14, 52–53); *see also Agront*, 73 F.3d at 198 (magistrate judge found the altercation could be heard inside the facility 25 yards away); *Alexander II*, 2015 WL 13091370, at *1, 4 (Alexander "yelled at a loud volume, using profane language" and "continued yelling even after a VA staff person began to move patients out of the lobby."). There was also evidence that Defendant tried to rush through the doors out of the ICU when medical staff did not allow her to leave. (ECF No. 34 at 16 (citing ECF No. 24 at 14, 17, 79).) Sergeant McClean testified that Defendant "several times . . . tried to force her way through the ICU doors — the outer doors," but was unsuccessful because the doors were malfunctioning. (ECF No. 24 at 17.) Defendant's behavior even led the hospital staff to call for police assistance to escort her to the emergency department as they were concerned "for their safety." (ECF No. 34 at 16–17 (citing ECF No. 24 at 12, 59, 62, 79)). There was evidence Defendant's "loud and boisterous behavior continued into the emergency department, where she resisted arrest and assaulted an officer, all while continuing to yell at the officers that she was leaving and telling them not to touch her. (ECF No. 34 at 17 (citing ECF No. 24 at 29, 30, 32, 64, 81, 88, 89, 90)); *see also Green*, 1994 WL 327727, at *1 (Green "was yelling at the admissions chief [at the VA] to get out of his face because he wanted to see a doctor.").

---

[5] The Court also rejects Defendant's argument in her reply that *Agront*, *Alexander I, Alexander II*, and *Green* are factually distinguishable. (ECF No. 37 at 3.) Defendant contends: Agront "was self-aware that he was becoming too loud"; Alexander "knew his behavior was disruptive" after "multiple encounters with law enforcement" and the court required the government to prove specific intent to disrupt; and Green's "behavior escalated in ways that affirmatively demonstrated that his actions were disorderly." (*Id.* at 4–5.) These conclusions are not present in the cases cited. *Agront*, 773 F.3d at 199–200; *Alexander I*, 669 F. App'x at 434; *Alexander II*, 2015 WL 13091370, at *4; *Green*, 1994 WL 327727, at *1.

Based on the foregoing, the Court finds that a rational trier of fact could have found beyond a reasonable doubt an intent to create loud, boisterous, and unusual noise. *See Oberdorfer*, 2014 WL 1343427, at *6.

### B. General Intent to Obstruct

Defendant argues that to be convicted under this prong of § 1.218(b)(11), "there must be evidence that her actions — not the actions of medical staff or law enforcement officers — knowingly obstructed the usual use of entrances, foyers and the like." (ECF No. 31 at 11.) Defendant notes there is evidence that medical staff and Officer Farr walked with her to an elevator and down a hallway that leads to the main exit of the emergency department and that her treating physician and other hospital staff entered the hallway when she was in the hallway, but her "conduct did not obstruct the hallway or any access point." (*Id.* at 11–12.) Defendant maintains she walked to the exit and was then arrested, and "[t]he actions of others in crowding the hallway or placing a gurney cross-wise in the hallway is not evidence that [she] acted to obstruct or knowingly obstructed any access point." (*Id.* at 12.)

In response, the Government notes the second prong includes "creating a 'commotion' loud enough to attract the attention of other employees or visitors and inhibiting the flow of public spaces." (ECF No. 34 at 17 (citing *United States v. Roper*, No. 03-M-361 (CLP), 2003 WL 24017061, at *13 (E.D. N.Y. Nov. 24, 2003).) The Government maintains Defendant's actions were done with the intent to leave the hospital and "the evidence presented provided more than a sufficient basis for a rational trier of fact to find [she] knowingly refused to return to her room in the ICU, thereby making the hallway 'essentially unusable.'" (*Id.* at 18.) The Government notes the "commotion" resulting in "an obstruction to the emergency room doors for approximately thirty minutes" was a direct result of Defendant's actions. (*Id.*) The Government contends it is irrelevant whether she intended to obstruct use of the ICU hallway and emergency room doors because she intended the acts that caused the obstructions — "refusing to obey commands from law enforcement, resisting arrest, and assaulting an officer." (*Id.*)

In *Roper*, the district court found the evidence proved beyond a reasonable doubt that the defendant Ralph Roper ("Roper") "unreasonably obstructed the usual use of the Hospital

entrance, foyer and lobby." 2003 WL 24017061, at *13.  When Roper was subject to a routine search upon entrance to the VA Hospital, he became "agitated, argumentative, and loud," ultimately requiring a police officer "to leave his post unattended" and four other officers "to abandon their duties long enough to secure . . . Roper in handcuffs" while Roper "physically struggled and resisted the officers' attempts to subdue him." *Id.* at *1, 13.  The court found under these facts that "there was clearly a 'commotion' sufficient to attract the attention" of police officers, a security clerk, and visitors to the VA and that Roper's "loud, aggressive behavior . . . unreasonably obstructed the usual use of the entrance and lobby of the VA hospital." *Id.* at *13.

Here, the Government accurately points out that the facts of the instant case parallel the facts of *Roper*.  In response to the medical staff and the officers' commands to stop when Defendant was in the emergency department, she said "she was leaving and not to touch her." (ECF No. 34 at 18 (citing ECF No. 24 at 29–30, 88–89).)  When officers made physical contact with Defendant, she "was immediately resistive, kicked an officer in the groin, had to be taken to the ground, and required three officers to subdue and handcuff her." (*Id.* (citing ECF No. 24 at 32, 34, 64, 81).)  Sergeant McClean testified that Defendant "initially reacted with a defensive resistance" and then "she dropped her weight, leaned forward and then [struck] rearward with her foot striking Lieutenant Molitor in the groin." (ECF No. 24 at 32.)  Sergeant McClean further testified that Defendant "was actively assaulting [the officers] to defeat [their] attempts to control her." (*Id.*)  Officer Farr testified that Defendant was "physically resistant," as "[s]he was still kicking, bucking her body off of the ground, throwing her limbs around, [and] pulling away from [the officers]." (*Id.* at 64.)  There was also evidence that medical staff "had a difficult time navigating around the gurney, medical equipment, nurses, police officers, and other workers who had responded to the area to subdue and treat [Defendant]." (ECF No. 34 at 18 (citing ECF No. 24 at 67).)  Officer Farr explicitly testified that nurses with a wheelchair "had to navigate — attempt to navigate, find ways around the obstructions" and had to move medical equipment out of the way.  (ECF No. 24 at 67–68.)

Based on the foregoing, the Court finds that a rational trier of fact could have found beyond a reasonable doubt an intent to obstruct the entrances, exits, and hallways at Mather VA.

*See Oberdorfer*, 2014 WL 1343427, at *6.

### C.    Intended to or Tended to Impede or Prevent Normal Operations

Defendant argues "[i]t is the normal and minimally necessary duty of medical staff to treat and respond to a patient at the level of care that the patient requires" and it is within the "normal duties" to tend to an ICU patient in crisis. (ECF No. 31 at 12.) Defendant contends the fact that she paced around the ICU is not evidence medical staff were drawn away from their normal duties, as no medical staff member testified that it was not normal to have two staff members interact with her after she regained consciousness and as she was still suffering from anxiety from being in the hospital. (*Id.* at 12–13.) Defendant notes the only evidence to the contrary was Sergeant McClean's testimony that there is "usually a one to one ratio" of patients to staff in the ICU, but she argues "nothing in her actions impeded anyone's duties" and "a concern that an anxiety-filled and impaired patient might act out in an unsafe way is not evidence that she in fact acted in such a manner." (*Id.* at 13.) Defendant argues there was no evidence to establish she was not competent to make the decision to leave the hospital, despite being told to stop by medical staff. (*Id.*) Defendant finally notes that she did not place the gurney and other equipment in the hallway to impeded access to and through the hallway, "[n]or did her conduct knowingly disrupt the performance of any medical staff who moved through the hallway." (*Id.* at 14.)

In response, the Government argues "the uncontested evidence showed that [Defendant] knowingly disrupted the normal operations of Mather VA," as her conduct required the attention of a second nurse and she had four to five Mather VA employees tending to her by the end of the altercation, including two nurses and a doctor who all left their duties in the ICU. (ECF No. 34 at 19.) The Government maintains "it is not within the medical staff's 'normal duties' to negotiate with a loud and disruptive patient who refuses to go back to her room and forcefully tries to break out of the ICU, to call for police assistance, or to escort a patient to the emergency room for no medical reason, but at her demand." (*Id.* at 20.)

The Ninth Circuit has interpreted conduct that "tends to impede" normal operations as "conduct that 'would tend to disturb the normal operation of a VA facility'" or "conduct that poses an 'actual or imminent interference' with that facility's operation." *Agront*, 773 F.3d at 197

11

n.5 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 111–12 (1972)).

Here, Sergeant McClean testified that Defendant's conduct required the attention of a second nurse. (ECF No. 24 at 15.) There is evidence that Defendant was sufficiently "loud and boisterous" that medical staff called for police assistance. (*Id.* at 12, 59, 61–62, 79.) Officer Farr testified that she observed the medical staff's demeanor "appeared very nervous and concerned" and Defendant's behavior escalated during her time in the ICU as she "got even louder . . . seemed to be more agitated . . . [and] was walking — pacing around more rapidly." (*Id.* at 61–62.) Both nurses were taken away from their normal duties in the ICU when they moved her down to the emergency department. (*Id.* at 15.) Additionally, the doctor responsible for Defendant's care also left his duties in the ICU to locate Thomas and police officers in an attempt to deescalate her behavior. (*Id.* at 21.) Sergeant McClean testified that by the end of this altercation, there were "four to five" medical staff and other Mather employees "in the general vicinity of the emergency room doors." (ECF No. 24 at 35.) Sergeant McClain further testified that a contract security officer came over after Defendant was on the ground "looking to provide assistance if [they] weren't able to control her" and that he observed the nurse who provided the COVID-19 screening put on gloves "which means that he is expecting to make contact with somebody." (*Id.* at 33.) Sergeant McClain's testimony establishes that these employees left their official duties to help or were distracted from performing their official duties by Defendant's conduct.

The Government is also correct that the facts of *United States v. Shepard* parallel the facts of the instant case. 362 F. App'x 107, 112–13 (11th Cir. 2010) (finding it "appropriate to focus on the extent to which the defendant impeded a government employee in the performance of his official duties" and that the defendant impeded the official duties of at least one VA employee when her resistance to his investigation of whether she had taken unauthorized photographs in the phlebotomy lab "caused it to become necessary for him to divert at least one additional officer away from his official duties . . . [and] caused other VA employees to halt their duties and congregate in the lab doorways.").

Based on the foregoing, the Court finds that a rational trier of fact could have found

beyond a reasonable doubt that Defendant's conduct "tend[ed] to impede or prevent[ed] normal operations" of Mather VA. *See Oberdorfer*, 2014 WL 1343427, at *6.

### IV.  CONCLUSION

For the foregoing reasons, the Court hereby AFFIRMS the magistrate judge's denial of Defendant's Motion for Judgment of Acquittal.

IT IS SO ORDERED.

**DATED: November 18, 2021**

Troy L. Nunley
United States District Judge